**UNITED STATES of America,
Appellee,**

v.

**William Erness THORESEN, Appellant.**

**UNITED STATES of America,
Appellee,**

v.

**Louise Banich THORESEN, Appellant.**

**Nos. 24432, 24433.**

United States Court of Appeals,
Ninth Circuit.

June 8, 1970.

See also D.C., 281 F.Supp. 598.

John H. Westover (argued), of O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz., David C. Schutter (argued), of Honolulu, Hawaii, Urban A. Lester (argued), of Ford, Ayer, Horan & Lester, Washington, D. C., for appellants.

Jerrold M. Ladar, Asst. U. S. Atty., Chief, Criminal Division; Cecil F. Poole, U. S. Atty., San Francisco, Cal., for appellee.

Before HAMLEY, DUNIWAY and ELY, Circuit Judges.

HAMLEY, Circuit Judge:

William E. Thoresen III (Thoresen), and his wife, Louise B. Thoresen, appeal separately from their convictions, after a joint non-jury trial, of 1967 violations of section 2(e) of the Federal Firearms Act.[1] Section 2(e) read as follows:

"(e) It shall be unlawful for any person who is under indictment or who has been convicted of a crime punishable by imprisonment for a term exceeding one year or who is a fugutive [sic] from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition."

Thoresen was convicted under counts one and five of a ten-count indictment returned on March 6, 1968. Counts one and five charged that on February 24 and March 15, 1967, respectively, Thoresen violated section 2(e) by shipping described rifles in interstate commerce after he had been convicted of a crime punishable by imprisonment for a term exceeding one year.

The prior conviction referred to in counts one and five, obtained upon a plea of guilty to grand larceny, was entered in the Superior Court of Hancock County, Maine, in September 1959. The grand larceny conviction involved the theft of six travel posters, having an assigned value of $150, from the Bar Harbor, Maine, terminal of the Canadian National Railway's Nova Scotia ferry.

Mrs. Thoresen was convicted under counts one and two of the same indictment. Count one, described above, charged Mrs. Thoresen as well as her husband as a principal. But in her case the antecedent event that triggered section 2(e) was not a prior conviction. Instead, it was, as charged in count one, that at the times in question (February 14 and March 15, 1967) she was under

1. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (1938), as amended, Act of Oct. 3, 1961, Pub.L.No. 87–342, § 2, 75 Stat. 757, since repealed, Omnibus Crime Control and Safe Streets Act of 1968, Pub.L.No. 90–351, Title IV, § 906, 82 Stat. 197, 234. See 15 U.S.C.A. § 902 (1970 Supp.).

indictment for two offenses punishable by imprisonment for a term exceeding one year. Count one describes the prior indictment as follows:

> "* * * Indictment, No. 205–67, returned by the Grand Jury of the County of Queens, State of New York, filed in the Supreme Court of Queens County, Criminal Term, on February 8, 1967, charging Louise Thoresen 'of the crime of possessing dangerous weapons as a felony' further described in said indictment as possession of 'a quantity of bombs and bomb shells,' and in count two thereof, with a violation of Section 1894 of the Penal Law of New York, a felony; * * *"

The second count charged Mrs. Thoresen as an aider and abetter. The grand jury therein alleged that on January 30, 1967, after Thoresen had been convicted of grand larceny (the Maine conviction), he violated section 2(e) by shipping a quantity of ammunition in interstate commerce, and that, contrary to 18 U.S. C. § 2, Mrs. Thoresen knowingly aided and abetted her husband in this conduct.

### Constitutionality of Section 2(e) as Applied to Thoresen

Thoresen argues that applying section 2(e) to him creates an irrational classification which deprives him of due process of law. He contends that while Congress may prohibit persons who have a dangerous propensity to misuse firearms from shipping weapons and ammunition in interstate commerce, such a propensity may not rationally be inferred from prior convictions of crimes having nothing to do with violence or with the use of weapons or ammunition.

■ The Due Process Clause of the Fifth Amendment provides essentially the same safeguard against invidious and unjustifiable discrimination in federal laws as the Equal Protection Clause of the Fourteenth Amendment does in the case of state laws. *See* Shapiro v. Thompson, 394 U.S. 618, 642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Schneider v. Rusk, 377 U.S. 163, 168, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964); Bolling v.

Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). It follows that the equal protection principles referred to below apply to Thoresen's due process attack on section 2(e) of the Federal Firearms Act.

■ When legislative classifications threaten basic civil rights, the Equal Protection Clause requires "some overriding statutory purpose," and the lines drawn in such statutes are subject to "the most rigid scrutiny." *E. g.*, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322 (1969) (right to travel); Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (familial relationships); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (miscegenation laws); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L. Ed.2d 675 (1965) (right to vote); McLaughlin v. Florida, 379 U.S. 184, 85 S. Ct. 283, 13 L.Ed.2d 222 (1964) (laws forbidding interracial cohabitation); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (right to criminal appeal); Skinner v. Oklahoma, ex rel. Williamson, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (right to procreate). Classifications drawn along racial lines are particularly "constitutionally suspect." *E.g.*, Loving v. Virginia, *supra*; McLaughlin v. Florida, *supra*; Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

■ On the other hand, "[i]n applying the Equal Protection Clause to social and economic legislation, we give great latitude to the legislature in making classifications." Levy v. Louisiana, 391 U.S. at 71, 88 S.Ct. at 1511. In these areas, "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). *See also* Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491, text following note 16 (1970); Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Railway Express Agency, Inc. v. New York,

336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949). *Cf.* Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957).

In our opinion, the right to ship weapons and ammunition interstate is not a basic civil right on the order of the right to vote or some of the other rights mentioned above. Laws designed to regulate this conduct are analogous to the economic and social welfare regulations given constitutional approval in the *McGowan* and *Dandridge* cases above which involved Sunday closing laws and maximum limits on welfare aid, respectively. Accordingly, we must uphold the classification scheme set up in the Federal Firearms Act if we find that it has any rational basis.

With these constitutional principles in mind, we turn to a consideration of Thoresen's contention that section 2(e), quoted above, as applied to him deprived him of due process.

As originally enacted in 1938, section 2(e) proscribed the shipping or transportation in interstate commerce of any firearms or ammunition by a fugitive from justice or by any person under indictment for, or who has been convicted of, "a crime of violence."

The purpose of Congress in enacting this statute was to "eliminate the gun from the crooks' hands, while interfering as little as possible with the law-abiding citizen * * *." S.Rep.No. 82, 75th Cong., 1st Sess. 2 (1937). In 1938, Congress thought that this could be done by prohibiting those who had been indicted or convicted of crimes of violence from transporting weapons and ammunition in interstate commerce. *See* Cases v. United States, 131 F.2d 916, 921 (1st Cir. 1942); United States v. Platt, 31 F.Supp. 788, 790 (S.D.Tex.1940).

The 1938 version of the Federal Firearms Act apparently did not prove to be as effective as Congress had expected. In recommending that section 2(e) and other portions of the Act be amended in 1961, the House Committee on Ways and Means reported that in the late 1950's and early 1960's "the infiltration of racketeering into society and the exploding crime rate have increasingly become a cause for national concern." 2 U.S. Code Cong. and Admin.News, p. 3068, 87th Cong. 1st Sess. (1961). This committee report stated that new laws were needed "so the Federal Government can better assist local authorities in the common assault against crime." *Id.*[2]

Responding to this view of the problem, Congress passed an act "To strengthen the Federal Firearms Act," Act of Oct. 3, 1961, Pub.L.No. 87–342, 75 Stat. 757. Section 2 of this 1961 amendment deleted the words "crime of violence" in section 2(d), (e) and (f) of the 1938 Act and inserted, in lieu thereof, the words "crime punishable by imprisonment for a term exceeding one year." The Senate committee report referred to in note 2 states that this legislation was introduced at the request of the Attorney General as an integral part of an anti-crime legislative program. The Senate report added that the amendment "would make it more difficult for the criminal elements of our society to obtain firearms."

A year and a half before Thoresen committed the offenses in question, the Federal Firearms Act was once more amended. Act of Sept. 15, 1965, Pub.L. No. 89–184, 79 Stat. 788. The 1965 legislation added a section 10 to the Federal Firearms Act. New section 10 provided a procedure whereby one convicted of a crime that did not involve the use of a firearm or other weapon or a violation of the Federal Firearms Act could seek relief from the disability established in section 2(e). Under this procedure, a convicted person could seek relief from the Secretary of the Treasury. The Secretary could grant such relief if it were established to his satisfaction:

"* * * that the circumstances regarding the conviction, and the appli-

---

**2.** The Senate Committee on Commerce made a similar report. S.Rep.No.364, 87th Cong., 1st Sess. 2 (1961).

cant's record and reputation, are such that the applicant will not be likely to conduct his operations in an unlawful manner, and that the granting of the relief would not be contrary to the public interest." 79 Stat. 788.[3]

It was entirely appropriate for Congress to seek curtailment of nationwide crime and racketeering by closing the avenues of interstate commerce to those who would use them to promote such illegal activity.[4] One obvious way of doing this was to prohibit those whose past records demonstrated a propensity to engage in such activity from transporting weapons or ammunition in interstate commerce. Congress originally thought persons having records of this kind would be sufficiently encompassed by limiting the proscription to persons who had been convicted of crimes of violence.

Experience apparently demonstrated that the class so defined was not sufficiently inclusive. Congress apparently found that nationwide crime and racketeering were being promoted by the transportation of weapons and ammunition in interstate commerce by some ex-convicts whose convictions did not involve violence. The problem of how to enlarge the section 2(e) class to include persons falling in the latter category without including those whose prior convictions had little relevance to nationwide crime and racketeering was obviously perplexing.

■ At least by 1965, Congress solved this classification problem in what seems to us a very practicable and reasonable manner. All persons convict-ed of prior crimes were brought within the ambit of the proscription, but those who could show that their past records were comparatively innocuous could gain exclusion. Taking into account our conclusion that the proscription in question—prohibition from transporting weapons and ammunition in interstate commerce—involved no basic civil right and that one who has been convicted of a relatively innocuous crime had a way of escaping the classification, we think that a state of facts exists which justifies, and renders rational, the section 2(e) classification. We therefore hold that, as applied to Thoresen, section 2(e) does not offend the Due Process Clause of the Fifth Amendment. *See* Williams v. United States, 426 F.2d 253 (9th Cir.1970).

Under this heading Thoresen also argues that, as applied to him section 2(e) permits the fact finder to draw irrational inferences which are impermissible under principles announced in Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), and Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943). We discuss this same contention below in connection with Mrs. Thoresen's appeal and the conclusion there stated is equally applicable here.

### Constitutionality of Section 2(e) as Applied to Mrs. Thoresen

As stated above, Mrs. Thoresen was convicted as an aider and abetter of her husband under count two of the indictment. Thus her conviction on that charge under section 2(e) rests on Thoresen's prior Maine conviction and

---

3. This statutory provision for relief from section 2(e) was implemented by the promulgation, on October 18, 1966, of 26 C.F.R. § 177.31(c). This was more than four months prior to the first offense of which Thoresen was convicted. The record does not indicate that he made any effort to obtain relief under the 1965 statute and the 1966 regulation.

4. In enacting and amending the Federal Firearms Act, Congress exercised its power under U. S. Const. Art. I, § 8, cl. 3 to regulate commerce among the several states. Cases v. United States, 131 F.2d 916, 923 (1st Cir. 1942) Under that constitutional authority " * * * Congress is free to exclude from interstate commerce articles whose use in the states for which they are destined it may reasonably conceive to be injurious to the public health, morals, or welfare, * * *." United States v. Carolene Products Co., 304 U.S. 144, 147, 58 S.Ct. 778, 781, 82 L.Ed. 1234 (1938).

not on her own New York indictment described in count one. Accordingly, Mrs. Thoresen's constitutional argument with reference to count two is the same as Thoresen's constitutional argument. For the reasons stated above we hold that, insofar as count two is concerned, section 2(e) is not unconstitutional as applied to Mrs. Thoresen.

Mrs. Thoresen's conviction under count one, on the other hand, depends upon the fact that on February 24, and March 15, 1967, when she and her husband assertedly shipped and transported weapons in interstate commerce, there was outstanding against her a New York indictment for two offenses involving the possession of bombs and bombshells. She argues that because section 2(e) provides that the existence of an outstanding indictment made it unlawful for her to transport weapons in interstate commerce, whereas in the absence of such an indictment she could have done so, the statute unconstitutionally deprives her of the presumption of innocence.

■ Mrs. Thoresen came to this criminal trial with a constitutionally-protected presumption of innocence. *See* Deutch v. United States, 367 U.S. 456, 471, 81 S.Ct. 1587, 6 L.Ed.2d 963 (1961). But section 2(e) does not purport to affect the presumption of innocence which cloaks all defendants in federal criminal proceedings. It does not authorize the fact finder at the criminal trial to infer guilt under the Federal Firearms Act from the existence of a prior indictment or even to discount the credibility of a witness because of such an indictment. Instead, as applied to Mrs. Thoresen, it represents nothing more than a Congressional determination that one who is under indictment for crimes such as possessing bombs and bombshells ought not to transport firearms in interstate commerce unless and until the indictment is dismissed or an acquittal is obtained.

■ There inheres in this determination a Congressional finding that persons under indictment for such offenses may have a propensity for misusing firearms. But it is a legislative finding operative only in formulating a statutory scheme for controlling misuse of firearms. Whether such Congressional finding results in an unreasonable classification contrary to equal protection principles is a separate question to be discussed below. In our opinion, this provision of the statute does not adversely affect the presumption of innocence which prevails at federal criminal trials and which is guaranteed by the Due Process Clause of the Fifth Amendment.

■ Mrs. Thoresen also argues that section 2(e), as applied to her, creates the type of presumption dealt with in such cases as Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969) and Tot v. United States, 319 U. S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943). These decisions are inapposite here. They pertain only to statutes authorizing the fact finder in a criminal trial to infer one fact (or element) from the existence of another. The section 2(e) provision in question is not of this character, since it represents only a determination made by Congress. It does not authorize a trial fact finder to infer one fact from another.

■ Mrs. Thoresen also argues that the classification drawn in section 2(e) between those who are under indictment and those who are not is irrational and therefore deprives her of due process. The principles to be applied in dealing with this question have been set out above in discussing Thoresen's similar constitutional attack on section 2(e).

In one respect the classification covering Mrs. Thoresen has less to recommend it than the classification with which Thoresen is concerned. The classification which he challenges looks to prior convictions, while the classification which Mrs. Thoresen attacks is based only upon an unproved prior charge. But, as applied to her, the indictment classification has a more direct relation-

ship to the prohibited conduct—interstate transportation of firearms—than does Thoresen's prior conviction classification. This is true because a prior conviction may pertain to an offense that has no connection with the use of weapons, while her indictment (for possession of bombs and bombshells) pertains to an offense having a direct connection with the use of weapons.

Having in mind the objectives of Congress in enacting this legislation, as discussed above, we find no warrant for a judicial determination that the indictment classification effectuated by section 2(e) is so lacking in rationality that it offends due process. Since we are only concerned here with a prior indictment for possession of bombs and bombshells, we think it not unreasonable for Congress to conclude that there is considerable likelihood that one indicted for such an offense has a propensity to misuse firearms. In so deciding we note that this conclusion by Congress, as crystallized in section 2(e), is not forever conclusive upon a person so indicted. The prohibitory effect of the classification disappears as soon as the indicted person obtains dismissal of the indictment or acquittal on the charge.

■■■ Mrs. Thoresen further contends on this branch of the case that the indictment provision of section 2(e) offends due process, because it forbids her from engaging in what is otherwise lawful activity without first giving her an opportunity to be heard in opposition to the charge in the indictment. The statute, however, is not as all-embracing as this argument suggests. While the provision in question does forbid indicted persons from transporting firearms in interstate commerce while the indictment is outstanding, the indictment serves only as a temporary block pending disposition of the criminal proceedings in which the indictment was filed. Bearing in mind that we are not dealing with statutory restrictions upon such constitutionally sensitive activities as free speech or the right to vote, we think Congress may, in pursuit of the sound objectives of the legislation, require indicted persons to tolerate this temporary limitation upon their right to transport weapons in interstate commerce.

In our opinion, section 2(e) is not unconstitutional as applied to Mrs. Thoresen. Accordingly we need not reach the Government's alternative argument that Mrs. Thoresen's conviction under count one can be sustained without regard to the constitutionality of section 2(e) as applied to her, on the theory that, under the proof, she aided and abetted Thoresen in the commission of his count one offense.

### Refusal to Inquire into Validity of Maine Conviction

Thoresen argues that the district court erred in denying him an opportunity to establish that the Maine conviction, which is an essential element of his federal conviction, is invalid under the United States Constitution.

In the Maine criminal proceeding, Thoresen asserts, he was denied the assistance of counsel, his plea of guilty was involuntary, the prosecution negligently withheld evidence as to the minimal value of the stolen posters, and he was deprived of equal protection of the law by being prosecuted for a felony when, in light of the minimal value of the posters, he was at most guilty of a misdemeanor.

After Thoresen was indicted under the Federal Firearms Act he attempted to establish the invalidity of the Maine conviction in a habeas corpus proceeding in the state courts of Maine. The Supreme Court of that state ultimately denied relief on the ground that Thoresen was not then under any form of actual or technical restraint in Maine. Thoresen v. State, Me., 239 A.2d 654 (1968). Thoresen thereafter sought similar relief in a federal habeas corpus proceeding instituted in the District Court for the District of Maine. In an unpublished order, the district court denied re-

lief on the ground that Thoresen was not then in custody within the meaning of 28 U.S.C. § 2241(c) and declined to issue a certificate of probable cause which would enable Thoresen to appeal. The First Circuit agreed that Thoresen had failed to demonstrate custody and refused to find the denial of a certificate improper. *In re* Thoresen, 395 F.2d 466 (1st Cir. 1968).

While the latter proceeding was pending in the Court of Appeals for the First Circuit, Thoresen, confronted with a rapidly approaching trial date in this criminal proceeding, pursued two additional courses in an attempt to have the Maine conviction declared invalid. He filed a habeas petition in the same district court in which this criminal cause was instituted, and he moved for a pretrial hearing in the criminal proceeding, both designed to determine the validity of the prior Maine conviction.

The habeas application and the motion for a pretrial hearing were denied. Thoresen moved in this court for a certificate of probable cause to review the habeas order, and for a writ of mandamus to require the district court to grant a pretrial hearing. Another panel of this court entered an unreported order denying both motions, stating in part:

"Trial, and not habeas corpus, is the appropriate manner of resolving the issue of guilt of the federal crime and subordinate issues relating to elements of the crime. If the holding in Burgett v. Texas, 389 U.S. 109 [88 S.Ct. 258, 19 L.Ed.2d 319] (1967), has been erroneously applied by respondent [judge] that fact can be raised upon appeal from final judgment. An

interlocutory ruling upon the question is not an appealable order and we decline to review the question at this time." [5]

The leading case in this area is Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), in which the Supreme Court reviewed, on certiorari, a Texas state criminal conviction for assault with intent to murder. In the Texas prosecution the state was permitted to introduce evidence of a prior Tennessee conviction in order to enhance petitioner's sentence under the Texas recidivist statute. However, the records of the Tennessee conviction on their face raised a presumption that petitioner had been denied his right to counsel in that proceeding, and therefore that that conviction was void. The Supreme Court reversed, stating:

"To permit a conviction obtained in violation of Gideon v. Wainwright [372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799] to be used against a person either to support guilt or enhance punishment for another offense (see Greer v. Beto, 384 U.S. 269, 86 S.Ct. 1477 [16 L.Ed.2d 526]) is to erode the principle of that case." 389 U.S. at 115, 88 S.Ct. at 262.

In *Burgett,* the Supreme Court had no occasion to discuss procedures to be followed when a defendant questions the constitutional validity of a prior conviction offered in evidence by the prosecution.[6] But in United States v. Martinez, 413 F.2d 61, 63–64 (7th Cir. 1969) the court held that the rationale of *Burgett* requires the district court to conduct a hearing to ascertain the constitutional validity of such prior convictions. *Accord,* Williams v. Coiner, 392

---

5. Thoresen thereafter renewed his motion in this criminal proceeding for a pretrial hearing concerning the validity of the Maine conviction. The motion was again denied by the trial court. When the Government introduced evidence of the Maine conviction at the trial, Thoresen preserved his objection.

6. In the Texas prosecution in *Burgett* the trial court permitted defendant to make a

showing as to the constitutional validity of the prior convictions and determined that question on the merits, although, as the Supreme Court held, its determination was incorrect. In the case now before us the trial court would not permit Thoresen to establish the facts concerning the Maine conviction, and it declined to determine the validity of that conviction.

F.2d 210, 212–213 (4th Cir. 1968). *See also* Braun v. Rhay, 416 F.2d 1055, 1059 (9th Cir. 1969). We agree with the *Martinez* and *Williams* holdings on this issue.[7]

■ The Government points out that in *Burgett* the certified records of the prior Tennessee conviction on their face raised a presumption that Burgett had been denied his right to counsel (389 U.S. at 112, 114, 88 S.Ct. 258), whereas the records of Thoresen's Maine conviction do not, on their face, evidence presumptive invalidity. The same contention was advanced and rejected in *Martinez.* 413 F.2d at 63. We are in agreement with *Martinez* that the rationale of *Burgett* requires that a defendant who asserts the constitutional invalidity of a prior conviction, either on its face or upon an examination of background facts, be given a reasonable opportunity to establish this contention, and to a trial court determination of the issue on the merits.

We therefore hold that Thoresen was entitled to an opportunity, at the trial, to establish the invalidity, under the Constitution, of the Maine conviction and to a determination of that issue, on the merits, by the trial court. Mrs. Thoresen is entitled to the benefit of this ruling insofar as her conviction under count two is concerned, since her conviction under that count was as an aider and abetter.

*Refusal to Inquire into Validity of New York Indictment*

As noted above, an essential element of Mrs. Thoresen's conviction as a principal under count one was her prior New York indictment for possessing dangerous weapons, a felony. Invoking Burgett v. Texas, *supra,* and other cases, Mrs. Thoresen argues that the trial court erred in denying her request for a hearing to determine whether the New York indictment had been secured in violation of her constitutional rights. Mrs. Thoresen challenged the validity of this indictment on the ground that the grand jury received evidence obtained as a result of several unlawful searches and seizures. To support this assertion, she presented, among other items, certified records of a New York state court opinion and order suppressing some of this evidence on federal constitutional grounds.

■ A federal indictment procured in part by illegally obtained evidence does not warrant quashing for that reason alone. If returned by a legally constituted non-biased grand jury and if valid on its face, it satisfies the requirements of the Fifth Amendment. Lawn v. United States, 355 U.S. 339, 349–350, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Raftis v. United States, 364 F.2d 948, 954–955 (8th Cir. 1966). We think the same rule should apply by analogy to a state indictment when, as under the count one charge against Mrs. Thoresen, the existence of the state indictment is an essential element of a federal offense.

Mrs. Thoresen also urges that she was entitled to a hearing so that she could establish the inaccuracy of the charge set forth in the New York indictment. The charge was untrue, she asserts, because: (1) she offered a quantity of explosives to United Airlines for storage, not for shipment as alleged in count two of the New York indictment; and (2) the materials referred to in count one of the New York indictment were not, as charged in that count, bombs or bombshells.

---

7. It is true that *Burgett, Martinez* and *Williams* all involved the use of prior convictions by prosecutors to "enhance punishment" under recidivist statutes, whereas in this case the Government relied on Thoresen's Maine conviction as the element that brought him within the scope of section 2(e) in the first place. But if anything this is an even stronger case for relief under *Burgett,* since in the absence of the possibly unconstitutional prior Maine conviction there would not have been a case against Thoresen under section 2(e) at all. Also, it should be noted that in the passage from *Burgett* quoted above, the Court proscribed the use of constitutionally invalid prior convictions "to support guilt * * *."

The *Burgett* principle which Mrs. Thoresen here seeks to apply pertains only to constitutional defenses in antecedent court proceedings. Assuming, but not deciding, that *Burgett* is applicable to prior indictments as well as to prior convictions, the untruth of the charges set forth in the New York indictment would not amount to a constitutional defect. Were the rule otherwise, defendants could, on a motion to quash an indictment, try the merits of the case. The place for this to be done is at the trial.

We hold that the trial court did not err in denying Mrs. Thoresen's motion for a hearing and for a determination as to the validity of the New York indictment.

### Sufficiency of Evidence to Convict Mrs. Thoresen under Count Two

While in count two the grand jury charged Thoresen as a principal and Mrs. Thoresen as his aider and abetter, she alone was convicted under that count. Thoresen was neither convicted nor acquitted under that count, and the district court later dismissed it as to him.[8] Mrs. Thoresen argues that, since Thoresen was not convicted as a principal under count two, she could not be convicted as an aider or abetter.

We do not agree. The alleged principal need not be convicted in order to convict a person as an aider or abetter. Pigman v. United States, 407 F.2d 237, 239 (8th Cir. 1969). In order to sustain a conviction as an aider or abetter it is sufficient that there be evidence warranting a finding, beyond a reasonable doubt, that an offense has been committed by a principal and that the principal, whether or not convicted, was knowingly aided or abetted by the accused. *See* Hendrix v. United States, 327 F.2d 971, 975 (5th Cir. 1964).

There is ample evidence to support the finding of the trial court (implicit from the finding that Mrs. Thoresen was an aider and abetter) that Thoresen, as principal, did the acts charged in count two, and that Mrs. Thoresen aided and abetted him knowing that he was then under the disability of a prior conviction. Accordingly, the district court's failure explicitly to convict Thoresen as a principal on that count does not require reversal of Mrs. Thoresen's aiding and abetting conviction. Of course the constitutional validity of Thoresen's Maine conviction, from which Mrs. Thoresen's conviction on count two derives, is a question yet to be determined.

### Failure to Report Grand Jury Proceedings

It was originally expected that the Thoresens would be tried on an indictment returned on June 28, 1967. Long prior to the anticipated trial on that indictment, defendants moved for an order requiring production of the grand jury testimony upon which that indictment was based. The district court denied this motion on February 9, 1968, because no court reporter had been present at the grand jury proceedings.

On January 29, 1968, in Haynes v. United States, 390 U.S. 85, 95–100, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), the Supreme Court held unconstitutional the statute upon which a portion of the June 28, 1967 indictment was based. Because of the *Haynes* decision, defendants anticipated that the Government would seek dismissal of that indictment and would attempt to reindict defendants on less vulnerable charges. Defendants wished to make certain that a transcript would be made of any new grand jury proceedings leading to their reindictment, so that it might be available to them in the event they were able to

---

8. The trial judge, who was the fact finder, originally found Thoresen guilty on count two. Counsel for Thoresen later incorrectly advised the judge that this count did not involve Thoresen. Government counsel, just as mistakenly, agreed with that statement. The trial judge accepted these representations and deleted his finding that Thoresen was guilty under count two. He subsequently dismissed all counts upon which no judgment had been rendered.

show a "particularized need" therefor. *See* Dennis v. United States, 384 U.S. 855, 869 et seq., 86 S.Ct. 1840, 16 L.Ed. 2d 973 (1966).

Defendants accordingly served upon the United States Attorney a demand letter, dated February 12, 1968, that defendants would seek a transcript of any future grand jury proceeding, and that a court reporter should therefore be in attendance. In this letter defendants offered to pay the expense of having a reporter in attendance. At the same time, defendants moved the court for an order compelling the presence of a court reporter at any subsequent grand jury proceedings involving defendants.

The motion was denied upon the ground that defendants were not entitled to a grand jury transcript as a matter of right. Defendants were reindicted on March 6, 1968, following grand jury proceedings conducted without a reporter. Defendants thereafter moved for a transcript of the second grand jury proceedings. This motion was denied for the same reason the first motion had been denied—no reporter having been present, it would not be possible to provide such a transcript.

Defendants argue that, under these circumstances, denial of the motion to require the presence of a court reporter at the second grand jury proceedings deprived them of a substantial right, and requires reversal.

 The rule prevailing in the Ninth Circuit is that the recording or transcribing of grand jury testimony is "permissive, not mandatory." Loux v. United States, 389 F.2d 911, 916 (9th Cir. 1968). *See also* Reyes v. United States, 417 F.2d 916, 918 (9th Cir. 1969); Jack v. United States, 409 F.2d 522, 524 (9th Cir. 1969). But the fact that a particular discovery procedure is "permissive" rather than "mandatory" does not mean that permission may be arbitrarily denied. Where a defendant, anticipating future grand jury proceedings involving himself, gives notice in advance that he will seek a transcript of

the proceedings if an indictment is returned and offers to pay the expense of having a reporter in attendance or shows inability to pay, a sound exercise of discretion would ordinarily call for the granting of a motion that a reporter be in attendance.

 However, we are unaware of any precedent in this Circuit for the dismissal of an indictment because of the Government's refusal to honor an advance request that a court reporter be present. We are therefore unwilling to invoke such a rule in this case absent a clear indication of prejudice, although we can give no assurance that such a rule may not be applied under similar circumstances in the future. We do not believe that there is here a clear indication of prejudice to defendants resulting from the unavailability of the grand jury transcript which they sought.

## Refusal to Suppress Evidence and Denial of Suppression Hearing

In pretrial proceedings under the original indictment, Mr. and Mrs. Thoresen sought to suppress evidence seized at several locations. All counts of the first indictment pertaining to Mrs. Thoresen were thereafter dismissed, and the motion to suppress was accordingly heard and determined only as to Thoresen. The motion was heard before a different district judge than the judge who ultimately tried this case, and an order was entered denying the motion. This order, which is in reality an extensive memorandum opinion, is reported in United States v. Thoresen, 281 F.Supp. 598, 609–622 (N.D.Cal.1967). As noted above, the original indictment was later dismissed as to Thoresen as well as his wife.

After the Thorsens were reindicted, they again moved for suppression of these seized items, alleging the illegality of one or two additional searches and seizures in their new motion. At the same time they moved for an evidentiary hearing, setting out what they regarded as crucial newly-discovered evi-

dence pertinent to most of the challenged seizures.

The trial court heard extensive argument on this motion but declined to grant an evidentiary hearing. The court did, however, review the six volumes of testimony taken before another judge at the suppression hearing conducted in relation to the original indictment. Thereafter, the trial court denied the motion to suppress the evidence. On this appeal the Thoresens argue that the trial court erred in denying them a hearing and in denying the suppression motion.

Defendants urged in the trial court, and advance here, three reasons why they were entitled to an evidentiary hearing on the new motion to suppress evidence, made after their reindictment. These reasons are: (1) since the original suppression hearing and determination concerned Thoresen only, Mrs. Thoresen has never had such a hearing and determination; (2) since the original suppression hearing and determination related only to the original indictment, whereas defendants were convicted under a new indictment containing new charges, they are entitled to a new hearing and new determination even though no new evidence will be produced; and (3) defendants have newly-discovered evidence which entitles them to a new suppression hearing and determination.[9]

■ In its brief on appeal, the Government does not address itself to the first of these reasons. Absent some showing that Mrs. Thoresen stipulated to, or acquiesced in, the trial court's reliance on the transcript of the first suppression hearing, in which she was not a party, we do not believe she can be denied a complete hearing on all of the search and seizure problems which bear upon her conviction. As we understand it, the searches and seizures which have a direct bearing upon Mrs. Thoresen's conviction under counts one and two are: (1) the search of the Thoresen's home at 2801 Broadway, San Francisco; (2) the seizure of items in the Mayflower van in front of 2801 Broadway; and (3) the seizure at Western Gillette, in San Francisco.

As to the search and seizure concerning which Mrs. Thoresen is entitled to a suppression hearing and determination, as indicated above, we think it appropriate to withhold consideration of Thoresen's arguments presented on this appeal. Since a new hearing as to these seizures must in any event be held, fairness dictates that Thoresen should have the benefit of any favorable determination his codefendant may gain therefrom. In this way, too, inconsistency in the search and seizure determinations as between Mr. and Mrs. Thoresen, will be avoided.

■ Thoresen may therefore participate in such hearing and question any adverse ruling therein in any future appeal, insofar as such ruling affects his conviction. In our opinion the trial court did not err in denying Thoresen's motion to suppress the evidence seized at Coast Drayage. Nor do we believe his showing as to newly-discovered evidence concerning that seizure was such as to require the trial court to make a redetermination of its legality. In our opinion, the circumstances that Thoresen's suppression hearing was under a superseded indictment does not entitle him to relitigate the issues there decided.

■ However, we believe that both Mr. and Mrs. Thoresen have made a sufficient preliminary showing that the seizure of Thoresen's attaché case in New York was illegal and had a substantial bearing upon their convictions. Thus

9. This newly-discovered evidence pertains not only to most of the searches and seizures dealt with at the original hearing, but also to an additional search and seizure in which law enforcement officials gained access to incriminating papers contained in an attaché case owned by Thoresen, found in Mrs. Thoresen's automobile in New York. Defendants assert, but the Government denies, that this information provided all the leads which were used in this case.

they are entitled to a suppression hearing and determination concerning that seizure. There seems to be a genuine issue of fact whether that seizure provided the Government with leads which are at the heart of its case against both defendants. If this proves to be true, the Government's entire case would be in jeopardy. *See* Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The judgments are reversed and the causes are remanded for: (1) a hearing on the constitutional validity of the prior Maine conviction that provides the underpinning for Thoresen's convictions on counts one and five and for Mrs. Thoresen's conviction on count two; (2) a suppression hearing on the legality of the seizure of the attaché case in New York and of the seizures from the home and van at 2801 Broadway, and at Western Gillette; and (3) the entry of new judgments. If the Government prevails in these remanded proceedings, the defendants may again appeal on issues not adjudicated herein, and such appeals may be considered on the present record and briefs as appropriately supplemented.

ELY, Circuit Judge (concurring):

While I concur in the majority's opinion, I must record my concern over the prosecution's failure to allow reporting and transcription of the grand jury's proceedings. Misgivings arise because the prosecution, by its deliberate conduct, established a basis for suspicion that it demeaned itself by engaging in a "cat and mouse game" wherein grave personal rights were at stake. I have never been able to accept the proposition that while extensive discovery promotes the cause of justice in civil controversies, any right to discovery on the part of a defendant in a criminal case must be severely curtailed. In the light of the relative gravity of the possible consequences of the ultimate disposition of civil and criminal proceedings, the disparity of treatment is at best inexplicable and at worst intolerable. It is not fair, I think, that the Government may use whatever notes it can take at a grand jury hearing while avoiding, by the simple expedient of not allowing a court reporter into the hearing, any possible duty of delivering a transcript of the proceedings to the affected defendant.[1]

I am aware that the Supreme Court has stated that federal courts may not order production of grand jury transcripts for inspection by defendants in the absence of a showing of "particularized need." Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400, 79 Sup.Ct. 1237, 3 L.Ed.2d 1323 (1959). But I also know that the later and fairer trend is toward the even-handed use of such transcripts. *See* Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966); United States v. Youngblood, 379 F.2d 365 (2d Cir. 1967). The reasons for the newer trend are apparent, since none of the traditional justifications for grand jury secrecy exist with any great degree of persuasiveness after the grand jury has performed its function. Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L.J. 1149, 1184 (1960); Developments in the Law—Discovery, 74 Harv.L.Rev. 940, 1057 (1961).

In *Dennis* the Supreme Court noted this trend and observed:

> "These developments are entirely consonant with the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice."

1. Judge Oliver J. Carter, one of the judges concerned with this case in the court below, apparently shares some of my views. Although he ruled that he was not, in the circumstances, empowered to order the production of the desired transcript, he expressed his personal view that transcripts of grand jury proceedings should be made available to those indicted as a result of such proceedings.

384 U.S. at 870, 86 S.Ct. at 1849. The Court also remarked:

> "In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact. Exceptions to this are justifiable only by the clearest and most compelling considerations."

384 U.S. at 873, 86 S.Ct. at 1851. Thus, I foresee the time, in the not very distant future, when federal grand jury transcripts will be available to defendants as a matter of right, with, of course, appropriate safeguards. Since 1897, those under indictment in California have been accorded this right (Cal. Penal Code § 925), and I am not aware that California's procedure has significantly impeded the enforcement of its criminal laws. Nor, I believe, has there been any serious protests by prosecuting authorities in certain federal districts wherein those indicted by federal grand juries have routinely received a transcript of the pertinent grand jury proceedings. Notwithstanding all of this, I agree that the appellants here made no such showing as was made by the defendants in *Dennis*; consequently, I must, at this time, yield to the compulsion of controlling precedent.